State of Nebraska, appellee, v.
Susan M. DeJong, appellant.
___ N.W.2d ___

Filed December 18, 2015.    No. S-15-028.

1. **Effectiveness of Counsel.** A claim that defense counsel provided ineffective assistance presents a mixed question of law and fact.
2. **Effectiveness of Counsel: Appeal and Error.** When reviewing a claim of ineffective assistance of counsel, an appellate court reviews the factual findings of the lower court for clear error.
3. ____: ____. With regard to the questions of counsel's performance or prejudice to the defendant as part of the two-pronged test articulated in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), an appellate court reviews such legal determinations independently of the lower court's decision.
4. **Postconviction: Constitutional Law: Appeal and Error.** In appeals from postconviction proceedings, an appellate court reviews de novo a determination that the defendant failed to allege sufficient facts to demonstrate a violation of his or her constitutional rights or that the record and files affirmatively show that the defendant is entitled to no relief.
5. **Postconviction: Appeal and Error.** Whether a claim raised in a postconviction proceeding is procedurally barred is a question of law.
6. **Judgments: Appeal and Error.** When reviewing questions of law, an appellate court resolves the questions independently of the lower court's conclusion.
7. **Postconviction: Constitutional Law: Proof.** In a motion for postconviction relief, the defendant must allege facts which, if proved, constitute a denial or violation of his or her rights under the U.S. or Nebraska Constitution, causing the judgment against the defendant to be void or voidable.
8. ____: ____: ____. A court must grant an evidentiary hearing to resolve the claims in a postconviction motion when the motion contains factual

allegations which, if proved, constitute an infringement of the defendant's rights under the Nebraska or federal Constitution.

 9. **Postconviction: Proof.** If a postconviction motion alleges only conclusions of fact or law, or if the records and files in the case affirmatively show that the defendant is entitled to no relief, the court is not required to grant an evidentiary hearing.

10. **Constitutional Law: Effectiveness of Counsel.** A proper ineffective assistance of counsel claim alleges a violation of the fundamental constitutional right to a fair trial.

11. **Effectiveness of Counsel: Proof: Appeal and Error.** To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense.

12. **Effectiveness of Counsel: Proof: Words and Phrases: Appeal and Error.** To show prejudice under the prejudice component of the *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), test, the defendant must demonstrate a reasonable probability that but for his or her counsel's deficient performance, the result of the proceeding would have been different. A reasonable probability does not require that it be more likely than not that the deficient performance altered the outcome of the case; rather, the defendant must show a probability sufficient to undermine confidence in the outcome.

13. **Effectiveness of Counsel.** A court may address the two prongs of the *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), test, deficient performance and prejudice, in either order.

14. **Postconviction.** The need for finality in the criminal process requires that a defendant bring all claims for relief at the first opportunity.

15. **Postconviction: Appeal and Error.** It is fundamental that a motion for postconviction relief cannot be used to secure review of issues which were known to the defendant and could have been litigated on direct appeal.

16. ____: ____. A motion for postconviction relief cannot be used to secure review of issues which were or could have been litigated on direct appeal, no matter how those issues may be phrased or rephrased.

17. **Postconviction: Due Process.** A postconviction motion asserting a persuasive claim of actual innocence might allege a constitutional violation, in that such a claim could arguably amount to a violation of a movant's procedural or substantive due process rights.

18. **Postconviction: Constitutional Law: Presumptions: Proof.** In order to trigger a court's consideration of whether continued incarceration could

give rise to a constitutional claim that can be raised in a postconviction motion, there must be a strong demonstration of actual innocence, because after a fair trial and conviction, a defendant's presumption of innocence disappears.

Appeal from the District Court for Jefferson County: Paul W. Korslund, Judge. Affirmed.

Susan M. DeJong, pro se.

Douglas J. Peterson, Attorney General, and Erin E. Tangeman for appellee.

Heavican, C.J., Wright, Connolly, McCormack, Miller-Lerman, Cassel, and Stacy, JJ.

Miller-Lerman, J.

## NATURE OF CASE

Susan M. DeJong was convicted after a jury trial of first degree murder and use of a deadly weapon to commit a felony for the death of her husband, Thomas DeJong (Tom). She was sentenced to a term of life imprisonment for the first degree murder conviction and a term of 50 to 50 years' imprisonment for the use of a deadly weapon to commit a felony conviction, to be served consecutively. On direct appeal, we affirmed Susan's convictions and sentences. See *State v. DeJong*, 287 Neb. 864, 845 N.W.2d 858 (2014). On September 26, 2014, Susan filed a pro se motion for postconviction relief in the district court for Jefferson County. On December 18, the district court filed an order in which it denied the motion without holding an evidentiary hearing. Susan appeals. Upon our review, including Susan's motion, her brief, and the files and records of this case, we determine that there is no merit to Susan's assignments of error, and we therefore affirm the decision of the district court in which it denied Susan's motion for postconviction relief without holding an evidentiary hearing.

STATEMENT OF FACTS

The events underlying Susan's convictions and sentences involve the death of her husband, Tom. In our opinion regarding Susan's direct appeal, we set forth the facts as follows:

BACKGROUND

On March 11, 2011, Susan called the 911 emergency dispatch service at approximately 4 p.m. Susan told the operator that her husband, Tom, was not breathing and was cold to the touch. Susan stated that Tom had gone to South Dakota to be with his "whore" and came home "all . . . beat up." The operator had Susan perform cardiopulmonary resuscitation on Tom until the emergency units arrived.

When emergency personnel arrived at the DeJong home, Susan was hysterical and she repeatedly stated that the "whore" had done this to Tom. Emergency personnel immediately began resuscitation efforts. Tom was not breathing, and there was no heartbeat. Dried blood was around his nostrils and the top of his mouth. His hands, arms, feet, legs, torso, and head were visibly scratched, cut, and deeply bruised. Emergency personnel were able to help Tom regain a heartbeat.

Tom was taken to the Jefferson Community Health Center and was later transported by ambulance to Bryan Health, west campus trauma center, in Lincoln, Nebraska (Bryan hospital). Laboratory reports and blood tests indicated a threat of imminent heart and renal failure. A chest x ray indicated multiple rib-sided fractures and a partially collapsed lung. A CAT scan revealed the following injuries: a swollen brain; a tremendous amount of fractures within the chest cavity, including the spine, the ribs, and the scapula; a comminuted fracture of the nose; and a possible fracture of the hyoid bone in the neck.

The treating physicians concluded that Tom would not be able to recover from the injuries. The physicians

asked Susan for permission to remove Tom from life support, and she granted the request. Tom passed away shortly thereafter.

### Susan's Statements at Hospitals

At the Jefferson Community Health Center, Rebecca McClure, a nurse, stayed with Susan while waiting for Tom's prognosis. The two of them waited in a small quiet room located outside of the emergency room.

Susan told McClure that she had not seen Tom since Wednesday and that he came home that Friday morning. She stated that Tom was "stumbling around in the house" and that the noise woke her up. Tom had been beaten, was cold, and quickly became unresponsive. Susan told McClure that Tom had spent the past days visiting the "whore" in South Dakota. According to Susan, the "whore" would beat Tom with tie-down straps from Tom's semi-truck. Susan also stated that the "whore" and Tom were trying to kill her by giving her a sexually transmitted disease (STD). McClure personally drove Susan home after Tom was transported to Lincoln, and Susan then drove herself to Bryan hospital in Lincoln.

Investigator Wendy Ground from the Lincoln Police Department arrived at Bryan hospital at approximately 10:20 p.m. Ground questioned Susan about Tom's injuries. Susan told Ground that Tom had returned home that morning. He looked pale, and he had stated that he did not feel well. Susan told Ground that Tom was apologetic and that he had told her he had made a mistake. According to Susan, Tom said his alleged mistress did not love him and that the mistress went "psycho" and wanted to kill him. Susan told Ground that the mistress had previously tried to kill Susan by cutting her vehicle's brake lines.

Ground asked Susan about Tom's medical history. Susan stated that Tom had been feeling weak and clumsy

for the past 2½ years. Susan stated that he was diagnosed with an STD 1½ years ago. Susan also explained that the current cut on Tom's lip was caused by a pipe when Tom was working with a cow.

After Tom had been declared dead, Ground asked Susan if she was willing to go to the police headquarters for an interview. Susan agreed.

### Interrogation of Susan at Police Headquarters

After arriving at the police headquarters at approximately 1 a.m., Ground placed Susan in an interview room. Ground left the room, and Susan began working on her written statement. Susan was left alone in the interview room from 1:12 to 3:04 a.m.

At approximately 3:04 a.m., Ground reentered the interview room. At 3:08 a.m., Ground read Susan her *Miranda* rights and Susan told Ground that she understood her rights. Susan proceeded to sign the *Miranda* waiver.

Ground began the interrogation by asking general questions about Tom's injuries and his whereabouts for the week. Susan repeated the facts as she had stated at Bryan hospital.

Susan stated Tom went to Seward, Nebraska, on Monday, March 7, 2011, for a job application and from there he went directly to South Dakota. Susan told Ground that she had talked to him on her cell phone on Monday, March 7, for approximately 44 minutes. According to Susan, Tom indicated that he wanted to be with "that thing." On March 8, Susan and Tom talked for 5 minutes, and Susan told Ground that she likely screamed at him because she was not happy.

At approximately 3:22 a.m., Susan told Ground that she was exhausted. But she continued to talk. Susan explained that the next time she heard from Tom was on Friday morning. She again repeated the same story of what had occurred that day. At approximately 3:34 a.m.,

Susan stated that she needed some sleep because she was exhausted.

The questioning continued, and Susan stated that she had confronted Tom when he came home on Friday morning because she was angry. Susan told Ground that she cannot say for sure that Tom drove home and that she does not know how he could have driven in his condition.

At approximately 3:41 a.m., Investigator Robert Farber entered the room and silently sat at the table. At 3:42 a.m., Susan began crying, and at 3:43 a.m., she stated, "I'm tired. I wanna go to bed, please. I'm done, I wanna go to sleep. I'm tired." Farber immediately interrupted her and introduced himself. Farber then told Susan that he had "a couple questions."

Farber began questioning. He asked Susan when Tom and she were married and whether they have common children. Farber questioned Susan about her relationship with Tom and about Tom's alleged relationship with his mistress. The questions became more directed and intense as Farber continued the interrogation.

In response to the questioning, Susan stated that everybody called Tom a "wheeney" and that he took the beatings from his alleged mistress. Susan also stated that Tom had slapped her in Minnesota. Susan explained that she was arrested for that incident because she decided to not tell the police that Tom had slapped her.

At approximately 4 a.m., Susan again stated, "I'm getting tired, I'm done, I'm tired." Farber interjected again before Susan completed the statement. Farber asked Susan if she had anything to do with the injuries. Susan answered no; Farber continued to ask questions, and Susan continued to answer. For the next 18 minutes, the questions from Farber became more pointed and directed.

At 4:18 a.m., Susan exclaimed, "I want a lawyer, please. I'm tired of this." "I will talk [to] them and they, I want some sleep, please." "I didn't, I will, I just wanted

to live and I loved him so much, and I just wanted to live and he wanted a divorce, and I just wanted to live with him. . . . I loved him." Farber said "okay" and left the room almost immediately. Ground followed.

Susan laid her head down at the table for approximately 30 seconds, stood, and grabbed her keys to leave. Susan opened the door to the interview room and asked to have a cigarette. Ground told her to take a seat. Susan turned around and mumbled, "So sorry. I'm sorry." Ground apparently paused to hear what Susan said and then reentered. Ground silently took a seat at the table in the same spot she sat during the entire interrogation.

Susan talked uninterrupted for nearly 8 minutes with a slow delivery, while Ground sat and listened. Susan stated: "So sorry. I'm sorry. (inaudible) beat by that whore. He used to come home, bruises, bloody nose, black eyes. He's got scars on his back that are not from me. He's got marks on him that are not from me. He'd come home and, well, he'd tell his boss (inaudible) on the trip. He'd tell me he did it on the truck going to (inaudible). Then he'd turn around, go to Sioux Falls and that Gloria. Oren called me today and asked if I'd seen your face. It's all bruised up. I told him that fuckin' cunt you're married to did it. (inaudible) I didn't ever touch him. Didn't ever touch him. When I slapped him in Fairbury, not Fairbury, in (inaudible), what the name of that town? I can't think of it, Burger King, God. The car pulls in there, parked, to get a burger but on the way in is when he finally admitted he'd been sleeping with that thing. Finally admitted it. He got our money, went into Burger King. I got out of the truck and proceeded to walk across the highway to the other little truck stop across the road and he followed me over there. Came up to me, grabbed one of the dogs and I picked my leg up. Leave it alone. And then I proceeded, I walked, was walking, trying to call my son to come get me but he

wouldn't answer his stupid phone. Standing there at the back, I'm like I'm going home. I'm going home. Well, fine, I'll take you home. I don't know. I'm going home. That's when he shoved me into the wall and cracked me in the jaw. And I slapped him. Some kid walked out of Burger King. So I'm yowling so he called the cops. Next thing I know they're showing up. He said I'll take you home, I'll take you home. Fine, I'll take you home. Fine, I'll take you home. Then we got in the truck. Next thing I know there's the cops. Everybody thinks Tom is such an innocent man. He used to be. He used to be the most loving, gentle, sweet man you could meet. Till he met that (inaudible). Then they started molesting children. I still say I think he was on drugs. Cuz you don't drive 14, 16 hours with nothing. My Blazer for one hasn't ever had a problem with the brakes. I hit a deer. Well, come to find out my front brakes are disconnected. Huh. Excuse me. I don't know. I just know that (inaudible) no more getting shoved. (inaudible) I didn't poison him. He is what he is from what he plays with. (inaudible) He told me he was going to kill me. (inaudible) kill me. (inaudible) Am I under arrest?"

Ground told Susan that the decision for arrest was up to the police department in Fairbury, Nebraska. Ground answered some questions from Susan, but did not ask Susan any questions.

Susan continued: "Self-defense, because I don't bruise and he does. That's pretty much the way that goes. (inaudible) she did (inaudible) to him. For what she did to him. He wasn't the man I married. What I told you about it is all true. It does deal drugs, (inaudible) drugs, go psycho. And it went psycho on him more than once. Does molest children. Little boy's name's Chris. . . . I have to be arraigned within 24 hours. I know that, why not. Just like the deal in Minnesota. And he'll walk away scott free. And there's a lot of the injuries he had [that were]

not from me. The worse one he get that I can remember is falling off the ladder. That one scared me. Why didn't I just leave. Why didn't I just run. Because he always showed up. He always showed up. (inaudible) I need some sleep. (inaudible) so tired. I just, I just need somebody to talk for me right now, I'm so tired. I'm too tried. I haven't (inaudible) for two days. Could you? I want a cigarette."

Ground responded: "Okay, just be patient with us." Susan continued: "No, I want a cigarette. I want a cigarette. Then He did take off and go back to S.D. (inaudible) either. It's all partly true. The whole story is partly true. I don't know. He came back beaten up from S.D. too. I didn't hit him in the head. (inaudible) when he fell on it. I stepped on it. That was after he threw it at me is how it ended up there. I'm not under arrest. I can go outside and have a cigarette if I want."

After a back and forth conversation between Susan and Ground, Susan stated, without being questioned: "(inaudible) you'll arrest me because that's the way it always goes. Let's (inaudible) her and she's the one that always gets in trouble. (inaudible) self defense, self preservation. They made sure of it. It takes a heck of a hit for me to bruise but . . . make sure that and Tom knew it."

Shortly thereafter, an unidentified female officer entered the room. Ground and the female officer took pictures of Susan's bruised hands and forearms. The interrogation video ends. Susan was subsequently arrested and charged with first degree murder and use of a deadly weapon to commit a felony.

### Hearing on Motion to Suppress Interrogation

On June 13, 2011, Susan filed a motion to suppress her statements given on March 12, which she argued were obtained in violation of her constitutional rights. Susan

argued that there were three different statements made by her that invoked her constitutional right to end the interrogation. At 3:43 a.m., Susan stated, "I'm done, I wanna go to sleep. I'm tired." At 4 a.m., Susan stated, "I'm getting tired, I'm done, I'm tired." And the last relevant statement was made at 4:18 a.m., when Susan stated, "I want a lawyer, please. I'm tired of this."

At the hearing, the district court accepted a joint stipulation that Susan was in custody at the time of the interrogation.

In its order, the district court found Susan's first two statements were not unequivocal and unambiguous statements that she wanted to cut off the questioning. Additionally, the court found that all of the statements made by Susan after exercising her right to counsel were voluntarily made and were not the result of the functional equivalent of interrogation.

Susan filed a motion to reconsider. Upon reconsideration, the district court suppressed the statements made from 4 to 4:18 a.m., because her statement that she was "done" was unequivocal and unambiguous. However, statements made before 4 a.m. were admissible, because Susan had not yet invoked her right to end questioning. The district court found that statements made after 4:18 a.m. were admissible, because they were not the result of questioning or the functional equivalent.

## RULE 404 HEARING

On January 26, 2012, the State filed an "Amended Motion to Conduct Hearing Pursuant to Neb. Rev. Stat. § 27-104 Regarding the Admissibility of § 27-404(2) Evidence." A hearing was held on the same date (rule 404 hearing), and evidence was accepted. There are three prior "bad acts" that the State wanted admitted for limited purposes.

For the first prior "bad act," the State offered the testimony of then-police officer Nicholas Schwalbe of

Jackson, Minnesota. Schwalbe testified that on May 31, 2010, he received a call of a fight in progress at a truck-stop. He identified the driver as Tom and the passenger as Susan. Schwalbe observed that Tom had a black eye, a fresh wound under that eye, and scabbing on his face, ear, and neck, as well as spots of fresh blood rolling down his neck. Susan was placed under arrest. Susan told Schwalbe that they were fighting because Tom was cheating on her.

The second event occurred in August 2010. James Platt, Susan's son, and Sharon Platt, James' wife, testified that Susan and Tom unexpectedly came to live with them that August. Susan told them that she and Tom needed to get away from their home, which was in South Dakota at the time. Both James and Sharon testified that Tom was "in bad shape." Tom's face was beaten and swollen, and he had bloody ears. When asked, Susan told James that the injuries were caused by a truckstop robbery. James testified that Susan had for years believed Tom was unfaithful with someone from work. Shortly thereafter, James testified that Susan and Tom moved to Jefferson County, Nebraska.

The third event occurred in late 2010. James and Sharon visited Susan and Tom at their new home in Jefferson County. Both testified that Tom looked "'ter-rible.'" He had cuts on his face and a split lip. Sharon asked Tom about his facial injuries, and Susan replied for Tom that the injuries happened at work when "the pigs got him."

At the hearing, the State also offered the testimony of McClure, Brian Bauer, and Ground. McClure testified about Susan's story that Tom had gone to South Dakota "probably up visiting his girlfriend." She testified about what Susan had told her at the hospital.

Bauer, who had employed Tom on his farm in Jefferson County, testified that Tom would come to work every 2 to

3 weeks visibly sore with bruises on his face, black eyes, split lips, and marks on his hands. According to Bauer, these injuries did not occur at work.

Ground testified that at the hospital, Susan stated that Tom's facial injuries and split lip were caused by working on the farm. Susan told her that the split lip was caused by a pipe when Tom was working with a cow.

Based on the evidence presented, the district court found that the May 31, 2010, incident in Minnesota was admissible as it pertains to the injuries observed on Tom and to Susan's statements as to the reason for their altercation, for the specific and limited purposes of demonstrating the existence of motive and intent. The district court further ordered that all three incidents were admissible for the specific and limited purposes of negating, or demonstrating the existence of, intent, identity of the perpetrator, and absence of mistake or accident.

## TRIAL

A jury trial was held on February 21, 2012. The State offered the testimony of the 911 dispatcher, the responding emergency personnel, the investigating officers, Farber, Ground, McClure, Bauer, Schwalbe, and James and Sharon. The State offered the video interrogation of Susan at the police headquarters, with the footage from 4 to 4:18 a.m. redacted. The three prior bad acts that were the subject of the rule 404 hearing were also presented to the jury. In addition, the following evidence was presented.

## EVIDENCE FOUND AT HOME

The DeJong home was searched on March 12, 2011. Tom's Chevrolet Blazer was parked in the detached garage. No evidence was found in the garage or either in or on the Blazer. Susan's white pickup truck was processed on March 15. Tom's blood was found on the hood and fender of the truck. Inside the pickup truck, there was a red duffelbag and a blue denim bag.

In the red bag, investigators found women's clothing, a yellow hammer, a blue hammer, toiletry items, men's pajamas, and Tom's wallet. The blue bag contained a computer, a lug wrench, and a cell phone.

DNA tests were conducted on this evidence, and results showed that the blue hammer had a mixture of Tom's and Susan's DNA. Susan's DNA was found on the handle of the yellow hammer, and a mixture of DNA was found in a blood sample on the claw area of the yellow hammer. Tom was the major contributor of that DNA. Tom's DNA was found in the bloodstains on the men's pajamas.

In the house, at least 70 blood drops were found throughout. No large pools of blood were found. Blood was found in the living room, kitchen, bathroom, dining room, and the master bedroom. Blood was also found on clothing items seized from the laundry room. A forensic scientist testified to which stains were left by Tom, by Susan, or by a mixture of the two. Tom's DNA was found repeatedly in the bloodstains throughout the house.

### Medical Testimony

Dr. Craig Shumard was working in the emergency room when Tom was brought by ambulance to the Jefferson Community Health Center. Shumard described Tom's injuries to the jury and testified that the injuries did not arise from natural causes or accidents. He testified that Tom's injuries were inconsistent with typical farmwork injuries.

Dr. Stanley Okosun, a trauma surgeon at Bryan hospital, testified to his treatment and care of Tom. Okosun testified that Tom's high levels of myoglobin indicated that the trauma inflicted on Tom occurred 12 to 24 hours prior to his arrival at Bryan hospital. Okosun testified that Susan told him that Tom's bruising was caused by working on a pig farm. Okosun testified that the explanation was highly unlikely. He further testified that with the injuries suffered, Tom could not have driven home on the

Friday morning before his death. According to Okosun, Tom's injuries could not have been caused by natural causes or a car accident. He attributed Tom's injuries to blunt force trauma caused by an assault.

Dr. Juris Purins was the radiologist who reviewed the CAT scan performed on Tom at Bryan hospital. The CAT scan revealed unusually severe head and brain injuries which are typically associated with a patient's not breathing. Tom's nose had a comminuted fracture, which means it was fractured in multiple places. Tom had a dislocation of the lens in his right eye, which was another unusual injury. Purins described a tremendous number of fractures within the chest cavity, including the spine, ribs, and scapula. One of the fractures was an old injury but the rest were recent. Purins also identified a fracture of the hyoid bone in the neck. Purins testified that the fractured hyoid bone, along with subcutaneous emphysema, indicated a potential choking injury. Purins opined that the injuries were the result of a "pretty severe beating," maybe from a hammer, and that the injuries would have prevented Tom from driving or walking.

Dr. Jean Thomsen was the pathologist who performed Tom's autopsy. Thomsen stated that she had "never seen someone so extensively injured." After the autopsy, Thomsen found the cause of death to be "[b]lunt force trauma to the head, neck, chest and extremities." In her opinion, Tom's death was a homicide.

In her autopsy report, Thomsen found defects on Tom's hands and arms that she described as defensive wounds. Thomsen found that the injuries were caused by some type of instrument. Thomsen testified that the injuries were C-shaped and semicircular and may have been caused by a hammer. The autopsy also confirmed a fracture of the hyoid bone in the neck, but she did not find other signs usually associated with manual strangulation beyond neck bruising.

Defense counsel offered the expert testimony of Dr. Robert Bux, a forensic pathologist. Bux agrees that this case was a homicide caused by multiple instances of blunt force trauma. He stated that he has "never personally seen a case like this with so much soft tissue contusion." Tom was "really beaten." Bux opined that the injuries occurred at least 24 hours prior to death, and maybe as many as 36 hours prior. He agrees that the wounds on Tom's hands and arms indicate that Tom was attempting to ward off an attack.

Bux disagreed that a clawhammer was used, because there were no circle bruises from the hammerhead, no raking marks from the claw, and no pattern of contusions consistent with the side of a hammer. He opined that based on a lack of hemorrhaging around the hyoid bone, the bone had been fractured during the autopsy. He argued that the brain injuries were caused not by the blunt force trauma but by Tom's not breathing while still at home. Bux also testified that Tom would have been able to walk and talk immediately after the beating he suffered, but that his condition would have continued to deteriorate. Bux also opined that because of the relatively small amounts of blood found in the home, the assaults that caused Tom's facial injuries likely did not occur in the home.

### INSTANT MESSENGER CHATS

An investigator seized Susan's computer and found relevant Internet instant messenger chats. James, Susan's son, confirmed the messages were sent to him from Susan under her handle "the_piglady." On September 24, 2010, "the_piglady" wrote in reference to Tom, "i can't do this . . . staying here anymore," "i've come to realize i literally hate him." She continued, "now i wish he was dead . . . i really hate him more than i have ever hated ANYONE." On February 14, "the_piglady" wrote that "i'm looking at getting rid of tom" and "i can't take or do this anymore."

TOM'S WHEREABOUTS
WEEK OF HIS DEATH

Beyond testifying about Tom's injuries while working at the farm, Bauer testified that on the Tuesday before his death, Tom worked a full day. Tom was bruised and had trouble getting around. On Wednesday and Thursday, Tom called in sick. On Thursday, Bauer drove by the house and noticed that both vehicles owned by the DeJongs were at the house, including Tom's Blazer.

James testified that he had a telephone conversation with Susan on the Thursday morning before Tom's death. James asked Susan what size tires were on Susan's white pickup truck. James testified that Susan asked someone else in the house. James assumed that the person was Tom and was surprised that Tom was not working. James testified that Susan did not mention in that telephone call that Tom was in South Dakota.

Cell phone records were also introduced into evidence. On March 8, 2011, the Tuesday before Tom's death, there were four calls from Susan's cell phone to Tom's cell phone and the calls "hit" or "pinged" off the nearby cell towers in the Fairbury and Hebron, Nebraska, areas. On Wednesday and Thursday, there were calls from Tom's cell phone to Bauer's cell phone. Both calls "hit" off cell towers in the Fairbury and Hebron areas.

ALLEGED MISTRESS

The woman who Susan alleged was Tom's mistress also testified at trial. The woman worked as a dispatcher for a small trucking company in South Dakota. Tom had been a truckdriver for that company. The woman testified that she and Tom had a working relationship only. She never spent time with Tom socially. She never had any type of sexual contact with Tom. She testified that she had no reason to want to hurt Tom or Susan. The woman testified that from March 8 to 11, 2011, she was on a trip to Minnesota and had no contact with Tom. She testified that she did not inflict Tom's injuries.

Convictions and Sentences

After deliberation, the jury found Susan guilty on count I, murder in the first degree, and guilty on count II, use of a deadly weapon to commit a felony. Susan was sentenced to life imprisonment for count I and 50 to 50 years' imprisonment on count II, to be served consecutively.

*State v. DeJong*, 287 Neb. 864, 867-80, 845 N.W.2d 858, 863-71 (2014).

Susan was represented both at trial and on direct appeal by lawyers from the same office, the Nebraska Commission on Public Advocacy. In our opinion on direct appeal, we restated and summarized Susan's assignments of error as follows:

[T]he district court erred by (1) admitting at trial the statements she made to investigators between 3:43 to 4 a.m.; (2) admitting at trial the statements she made to investigators after 4:18 a.m.; (3) admitting at trial evidence of Tom's injuries on prior occasions and her related statements concerning the injuries, because there was no clear and convincing evidence that she had committed a crime, wrong, or act with respect to those injuries; and (4) admitting at trial evidence of Tom's injuries on prior occasions and her related statements concerning the injuries, because the probative value of the evidence was substantially outweighed by the danger of unfair prejudice.

*Id.* at 880, 845 N.W.2d at 871-72.

With respect to Susan's assignments of error on direct appeal, we determined that her statements made from 3:43 to 4 a.m. should have been suppressed, but we concluded that the error was harmless. We further determined that her statements made after 4:18 a.m. were not required to be suppressed. With respect to the evidence admitted regarding the prior bad acts, for purposes of the direct appeal, we assumed without deciding that the admission of the evidence was error; however, we found the admission of the evidence to be

harmless. Based on these determinations, we affirmed Susan's convictions and sentences on direct appeal.

On September 26, 2014, Susan, acting pro se, filed a motion for postconviction relief. As we read her motion, Susan alleged that she received ineffective assistance of counsel because counsel failed to "investigate further" and question more extensively numerous witnesses who testified at trial and failed to argue on direct appeal that there was insufficient evidence to support her convictions and sentences. Susan also alleged, as we read her motion, that the district court erred when it admitted evidence related to prior bad acts and other evidence. Susan also alleged in her motion that she is actually innocent.

On December 18, 2014, the district court denied Susan's motion for postconviction relief without holding an evidentiary hearing.

Susan appeals.

## ASSIGNMENTS OF ERROR

Susan assigns, restated and consolidated, that the district court erred when it denied her motion for postconviction relief without holding an evidentiary hearing on her claims that (1) she received ineffective assistance of counsel when counsel failed to further investigate and ask questions of the witnesses and failed to argue on direct appeal that the evidence presented at trial was insufficient; (2) the district court improperly admitted evidence generally and, in particular, evidence of prior bad acts; (3) she is actually innocent; and (4) the district court improperly denied her motion for new trial.

## STANDARDS OF REVIEW

[1-3] A claim that defense counsel provided ineffective assistance presents a mixed question of law and fact. *State v. Thorpe*, 290 Neb. 149, 858 N.W.2d 880 (2015). When reviewing a claim of ineffective assistance of counsel, an appellate court reviews the factual findings of the lower court for clear error. *Id*. With regard to the questions of counsel's

performance or prejudice to the defendant as part of the two-pronged test articulated in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), an appellate court reviews such legal determinations independently of the lower court's decision. *State v. Thorpe, supra*.

[4] In appeals from postconviction proceedings, an appellate court reviews de novo a determination that the defendant failed to allege sufficient facts to demonstrate a violation of his or her constitutional rights or that the record and files affirmatively show that the defendant is entitled to no relief. *State v. Huston*, 291 Neb. 708, 868 N.W.2d 766 (2015).

[5,6] Whether a claim raised in a postconviction proceeding is procedurally barred is a question of law. *State v. Thorpe, supra*. When reviewing questions of law, an appellate court resolves the questions independently of the lower court's conclusion. *Id*.

## ANALYSIS
*Relevant Postconviction Law.*

We begin by reviewing general propositions relating to postconviction relief and ineffective assistance of counsel claims before applying those propositions to the claims alleged and argued by Susan in this appeal. We note that because Susan was represented both at trial and on direct appeal by lawyers from the same office, the Nebraska Commission on Public Advocacy, this postconviction proceeding is effectively her first opportunity to claim that her trial counsel provided ineffective assistance of counsel. See *State v. Fox*, 286 Neb. 956, 840 N.W.2d 479 (2013).

[7] The Nebraska Postconviction Act, Neb. Rev. Stat. § 29-3001 et seq. (Reissue 2008 & Cum. Supp. 2014), provides that postconviction relief is available to a prisoner in custody under sentence who seeks to be released on the ground that there was a denial or infringement of his or her constitutional rights such that the judgment was void or voidable. *State v. Crawford*, 291 Neb. 362, 865 N.W.2d 360 (2015). Thus, in a motion for postconviction relief, the defendant must allege

facts which, if proved, constitute a denial or violation of his or her rights under the U.S. or Nebraska Constitution, causing the judgment against the defendant to be void or voidable. *State v. Crawford, supra*.

[8,9] A court must grant an evidentiary hearing to resolve the claims in a postconviction motion when the motion contains factual allegations which, if proved, constitute an infringement of the defendant's rights under the Nebraska or federal Constitution. *State v. Huston, supra*. If a postconviction motion alleges only conclusions of fact or law, or if the records and files in the case affirmatively show that the defendant is entitled to no relief, the court is not required to grant an evidentiary hearing. *Id*.

[10-13] A proper ineffective assistance of counsel claim alleges a violation of the fundamental constitutional right to a fair trial. *State v. Crawford, supra*. To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense. *State v. Crawford, supra*. To show prejudice under the prejudice component of the *Strickland* test, the defendant must demonstrate a reasonable probability that but for his or her counsel's deficient performance, the result of the proceeding would have been different. *State v. Huston, supra*. A reasonable probability does not require that it be more likely than not that the deficient performance altered the outcome of the case; rather, the defendant must show a probability sufficient to undermine confidence in the outcome. *Id*. A court may address the two prongs of this test, deficient performance and prejudice, in either order. *Id*.

*Further Investigation and*
*Questioning of Witnesses.*

Susan alleges that her counsel was ineffective at trial for failing to further investigate and ask more questions of certain

witnesses at trial, including Rebecca McClure, the nurse who gave Susan a ride home; Dr. Craig Shumard, an emergency room physician; Wendy Ground, a police investigator who interviewed Susan; James Platt and Sharon Platt, Susan's son and daughter-in-law; and Brian Bauer, Tom's employer. We determine that the district court correctly rejected this claim without an evidentiary hearing.

As we read Susan's motion for postconviction relief and her appellate brief, Susan argues that if trial counsel had done further investigation or had asked more questions of these and other witnesses on cross-examination, it would have been shown that on the night Tom was hospitalized, Susan did not make statements that she had injured Tom and that there was an effort by others to keep Susan from seeing Tom. Susan also contends that further questioning would have highlighted inconsistencies in the witnesses' testimony. Susan further argues that more intensive questioning of the witnesses would have revealed to the jury that she cared for and was concerned for Tom and that she had a good relationship with Tom. Thus, Susan contends that further questioning would have portrayed her in a more sympathetic light or, in any event, cast doubt on the degree of credibility to be accorded to the witnesses.

Susan makes no specific allegations of what further investigation would have uncovered or how such investigation and further questioning would, with reasonable probability, have resulted in her acquittal. Her allegations are speculative and, in many cases, pose rhetorical "what if" questions as to how the trial might have unfolded if the examinations had been phrased differently or, in some cases, proposed lines of questioning. Speculative allegations are an insufficient basis for postconviction relief. See *State v. Vanderpool*, 286 Neb. 111, 835 N.W.2d 52 (2013). Susan did not allege facts which, if proved, would constitute a violation of her constitutional rights.

Accordingly, we determine that Susan's counsel was not deficient for allegedly failing to further investigate or ask more questions on cross-examination of the witnesses identified in

Susan's motion. Susan is entitled to no relief on this claim. The district court did not err when it denied relief on this claim without an evidentiary hearing. We affirm this portion of the district court's order.

*Arguing Insufficient Evidence*
*on Direct Appeal.*

Susan alleges that her counsel was ineffective for failing to explicitly argue on direct appeal that the evidence presented at trial was insufficient to support her convictions for first degree murder and use of a deadly weapon to commit a felony. As we read her motion for postconviction relief and appellate briefs, Susan argues that there was a lack of sufficient evidence, because no one witnessed her kill Tom and little DNA evidence was recovered from various items, including items found in the search of the DeJong home. The district court correctly rejected this claim without an evidentiary hearing.

The records and files in this case refute Susan's contention that there was not sufficient evidence to sustain her convictions. Contrary to Susan's argument, this court necessarily considered the sufficiency of the evidence in our analysis of the errors asserted on direct appeal. There was extensive evidence presented at trial that demonstrated Susan's guilt, and we set forth the evidence against Susan in our opinion on direct appeal by stating:

The State's evidence demonstrated that Susan's story that Tom was beaten by his alleged mistress was completely fabricated. The evidence presented at trial showed that Tom was home that week and never left for South Dakota.

Bauer, Tom's boss, testified that Susan's and Tom's vehicles were at the DeJong home the day before Tom allegedly returned from South Dakota. Bauer testified that Tom had called in sick to work on that Wednesday and Thursday. Cell phone records confirm that those calls "pinged" off cell towers near the DeJong home and not in South Dakota. Susan's son, James, testified that

he believed Tom was at the DeJong home on Thursday because of a telephone conversation he had with Susan that day. At trial, Susan presented no evidence that Tom had actually gone to South Dakota. Additionally, the alleged mistress testified that she and Tom never had an extramarital relationship, that Tom did not visit her that week, and that she did not cause his injuries.

Other evidence demonstrates Susan's motive for killing Tom. During her hospital interview, Susan ranted about Tom and his "whore." Susan alleged that Tom and that "whore" used drugs and molested children. Susan blamed the "whore" for ruining her relationship with Tom. Additionally, the State introduced Susan's Internet instant messages in which Susan stated that she "hate[d]" Tom, that she wished he were dead, and that she was "looking at getting rid of" him.

The evidence at trial also showed that Susan may have been the only person with the opportunity to inflict Tom's injuries. The medical testimony offered at trial established that many of Tom's injuries were inflicted well within 72 hours of his death. That indicates that Tom's injuries may have occurred any time after Tuesday. The evidence indicates that during those periods of time, Tom was at home with Susan. There was no evidence presented, other than Susan's fabricated statements about South Dakota, that Tom left the home on Wednesday, Thursday, or Friday. There was no evidence presented that someone other than Susan had spent time with Tom after Tuesday.

The physical evidence also supported Susan's guilt. All of the medical experts testified that Tom was severely assaulted and that his injuries were not caused naturally or by accident. His death was caused by blunt force trauma. Tom had defensive wounds on his hands and arms. Droplets of blood were found throughout the house, including on Susan's clothes. A red bag containing

women's clothes, men's pajamas, Tom's wallet, and two hammers and a blue bag containing a computer, a lug wrench, and a cell phone were found in Susan's truck. Thomsen, the pathologist who performed Tom's autopsy, testified that the injuries to Tom's body were caused by some type of instrument and that the instrument could have been a hammer. After the interrogation, photographs and testimony established that Susan had bruises and sores on her palms that would be consistent with swinging a hammer. The bloodstained blue hammer recovered in Susan's truck had a mixture of Tom's and Susan's DNA. Susan's DNA was found on the handle. Tom's DNA was found on the head of the hammer.

*State v. DeJong*, 287 Neb. 864, 885-86, 845 N.W.2d 858, 875-76 (2014).

We have reviewed the record in this case, and given the extensive evidence presented at trial against Susan, we determine that the records and files in this case affirmatively show that Susan was entitled to no relief on her claim that there was insufficient evidence to support her convictions and that counsel's appellate argument failed to present the issue for our consideration. In connection with this contention, Susan has failed to suggest any facts which, if proved, constitute an infringement on her constitutional rights. The record shows that Susan was not prejudiced by counsel's conduct on direct appeal, and therefore, the district court did not err when it denied relief on this claim without an evidentiary hearing. We affirm this portion of the district court's order.

## Admission of Evidence Related to Prior Bad Acts.

Susan alleges that the district court erred at trial when it admitted evidence of prior bad acts, including evidence of Tom's injuries on prior occasions and Susan's statements related to those injuries. As we read her motion for postconviction relief and her appellate briefs, Susan contends that

this error resulted in a violation of her constitutional rights of due process, the presumption of innocence, her right to a fair trial, and her right to privacy. The district court correctly rejected her claim without an evidentiary hearing.

[14-16] To the extent Susan alleges that her constitutional rights of due process, the presumption of innocence, her right to a fair trial, and her right to privacy were violated when the evidence related to the prior bad acts was admitted at trial, this claim is procedurally barred. We have stated that the need for finality in the criminal process requires that a defendant bring all claims for relief at the first opportunity. *State v. Watkins*, 284 Neb. 742, 825 N.W.2d 403 (2012). It is fundamental that a motion for postconviction relief cannot be used to secure review of issues which were known to the defendant and could have been litigated on direct appeal. *Id*. And in this case, the prior bad acts issues were both known to and litigated by Susan on direct appeal. We have recently stated: "A motion for postconviction relief cannot be used to secure review of issues which were or could have been litigated on direct appeal, no matter how those issues may be phrased or rephrased." *State v. Thorpe*, 290 Neb. 149, 156, 858 N.W.2d 880, 887 (2015).

The issue of the admission at trial of evidence related to the prior bad acts was specifically addressed on direct appeal, where Susan argued that the district court erred when it admitted evidence of Tom's injuries on prior occasions and her statements related to those injuries. For the purposes of the direct appeal, we assumed, without deciding, that the admission of this evidence was error. However, we determined that the erroneous admission of the evidence was harmless.

In the direct appeal, we began our harmless error analysis by "noting that the untainted, relevant evidence strongly supports Susan's guilt." *State v. DeJong*, 287 Neb. 864, 895, 845 N.W.2d 858, 882 (2014). We further stated that "the untainted evidence not only provided evidence of guilt but also established Susan's motive, her intent, her identity as the killer,

and the absence of mistake in Tom's death." *Id*. at 896, 845 N.W.2d at 882. We also stated that "there is cumulative evidence establishing that Tom was often injured prior to his death and that the likely perpetrator was Susan." *Id*. at 895-96, 845 N.W.2d at 882. Accordingly, in determining that the admission of the evidence regarding the prior bad acts was harmless, we stated:

> When viewed in relation to the whole record, the evidence erroneously admitted at the rule 404 hearing was insignificant. This evidence did not provide a crucial link to allow the State to make its case. In that sense, the evidence admitted at the rule 404 hearing was largely unnecessary. Thus, we hold that the erroneously admitted evidence was insignificant and did not materially influence the jury's verdicts. Any error was harmless.

*State v. DeJong*, 287 Neb. at 897, 845 N.W.2d at 882-83.

Because the issue of the admission at trial of evidence related to the prior bad acts was raised and addressed on direct appeal, this claim is now procedurally barred. Therefore, although Susan rephrases her claim for postconviction purposes, we determine that the district court did not err when it denied postconviction relief on this claim without an evidentiary hearing. We affirm this portion of the district court's order.

*Actual Innocence.*

Susan alleges that the district court erred when it denied her motion for postconviction relief without an evidentiary hearing, because she is actually innocent. The district court correctly rejected her claim without an evidentiary hearing.

[17,18] We have previously acknowledged the possibility that a postconviction motion asserting a persuasive claim of actual innocence might allege a constitutional violation, in that such a claim could arguably amount to a violation of a movant's procedural or substantive due process rights. *State v. Phelps*, 286 Neb. 89, 834 N.W.2d 786 (2013). However, in order to trigger a court's consideration of whether continued

incarceration could give rise to a constitutional claim that can be raised in a postconviction motion, there must be "'[a] strong demonstration of actual innocence'" "'because after a fair trial and conviction, a defendant's presumption of innocence disappears.'" *Id.* at 94, 834 N.W.2d at 791, quoting *State v. Edwards*, 284 Neb. 382, 821 N.W.2d 680 (2012). Indeed, the U.S. Supreme Court has held that the threshold is "'extraordinarily high.'" *Id.* at 94, 834 N.W.2d at 791-92, quoting *Herrera v. Collins*, 506 U.S. 390, 113 S. Ct. 853, 122 L. Ed. 2d 203 (1993).

In support of her claim that she is actually innocent, Susan relies heavily on the assertion that there were no direct witnesses to Tom's murder. She states that "[n]o one ever witnessed anything, verbally or physically, to prove absolutely without a doubt" that she murdered Tom. Brief for appellant at 6. Susan also argues that there was insufficient DNA or other physical evidence found in various locations, including the DeJong home, to link her to Tom's murder.

Although there were no direct witnesses to Tom's murder, when viewed in the light of the extensive evidence adduced at trial as summarized in our opinion on direct appeal and quoted above, Susan's allegations fall well short of the "extraordinarily high" threshold showing of actual innocence which she would be required to make before a court could consider whether her continued incarceration would give rise to a constitutional claim. Susan did not allege facts sufficient to necessitate an evidentiary hearing. Therefore, we determine that the district court did not err when it denied relief without an evidentiary hearing on this claim. We affirm this portion of the district court's order.

*Denial of Motion for New Trial.*

Susan assigns as error that the district court erred when it denied her motion for new trial. We determine that the district court correctly denied this claim without an evidentiary hearing.

The record belies Susan's allegation. The record establishes that Susan withdrew her motion for new trial at the time of sentencing. Accordingly, the district court did not deny her motion for new trial. We determine that the district court did not err when it denied relief on this claim without an evidentiary hearing. We affirm this portion of the district court's order.

## *Admission of Other Evidence and Other Claims of Postconviction Relief.*

Susan argues on appeal that certain evidence should not have been admitted at trial, such as items located during searches, including the search of the vehicle and home. She also makes allegations in her postconviction motion regarding other evidence she asserts is objectionable, but, other than listing a catalog of constitutional provisions, she does not necessarily direct our attention to specific constitutional errors regarding these claims on appeal. Her allegations of conclusions do not require an evidentiary hearing. See *State v. Huston*, 291 Neb. 708, 868 N.W.2d 766 (2015). We have reviewed her motion and have determined that her claims either are speculative and fail to affirmatively show that she is entitled to relief or are refuted by the record and files in this case. See *id*. Accordingly, we determine that Susan did not allege facts sufficient to necessitate an evidentiary hearing, and the district court did not err when it denied postconviction relief without an evidentiary hearing.

## CONCLUSION

We find no merit to Susan's assignments of error. Therefore, we determine that the district court did not err when it denied her motion for postconviction relief without an evidentiary hearing.

AFFIRMED.