IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


STATE V. JOHNSON


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


STATE OF NEBRASKA, APPELLEE,

V.

JEREMY L. JOHNSON, APPELLANT.


Filed February 7, 2017.    No. A-15-994.


Appeal from the District Court for Douglas County: MARLON A. POLK, Judge. Affirmed.

F. Matthew Aerni, of Berry Law Firm, for appellant.

Douglas J. Peterson, Attorney General, and Nathan A. Liss for appellee.


RIEDMANN and BISHOP, Judges, and MCCORMACK, Retired Justice.

BISHOP, Judge.

## INTRODUCTION

In 1997, Jeremy L. Johnson was convicted of multiple felonies stemming from two 1996 shootings in Omaha, Nebraska. Johnson's direct appeal and previous two motions for postconviction relief were denied. Johnson filed in the Douglas County District Court this third motion for postconviction relief, or, in the alternative, a petition for writ of error coram nobis; both based on alleged newly discovered evidence. Johnson appeals from the district court's denial of his motion and petition. We affirm.

## FACTUAL BACKGROUND

At approximately midnight on May 9, 1996, a white Chevy Cavalier drove by the police station on 40th Street in Omaha, Nebraska. A passenger in the Cavalier fired several gun shots at the police station. Officers pursued the Cavalier, eventually finding it at the Pleasantview Projects. The first officer to arrive saw an African-American male approximately 25 to 30 feet from the

- 1 -

Cavalier in the Pleasantview Projects parking lot who walked from the parking lot to an apartment. After receiving permission to search the premises, police found a group of people within the apartment, including Jerome Davis. Police also found the Cavalier keys in the bathroom trash can and a semi-automatic pistol magazine in the toilet water tank. Police eventually learned that the white Cavalier belonged to Davis' girlfriend, and that he had borrowed the car earlier in the day. Police arrested Davis and impounded the Cavalier.

At the time he was arrested, Davis was 19 years old and a member of the Crips gang. Davis testified that he was spending time with two friends, Cornell Scott and Levar Smith, on the night of the shooting. Before the shooting, Davis testified that several members of the Bloods gang shot at the car he, Scott, and Smith were driving. Davis said that Scott and Smith shot back at the rival gang members as he drove away.

After the encounter with the Bloods, Davis drove back to the Pleasantview Projects. Later, Davis agreed to give Scott and fellow Crips member Johnson a ride home. Davis claimed that Johnson asked him to drive by the police station and that Johnson fired at the station with two pistols. When they returned to the Pleasantview Projects, Davis claimed Johnson warned him to keep quiet about what happened and that Johnson went to a friend's house.

At trial, Christopher Wright, a friend of Johnson, testified that Johnson spoke out against doing any drive-by shootings on May 9, 1996. Wright said he was spending time at his sister's apartment and that several Crips gang members were present, discussing plans for a retaliation shooting against rival gang members. Wright testified that after Johnson spoke out against the shootings, Scott and Davis left the apartment and got into a car while Johnson did not. Later that night, Davis and Scott returned to Pleasantview in the same car they left in earlier. Wright said that he saw only Davis and Scott get out of the car. Wright also said that Scott drove a gray Caprice Classic in 1996.

Maurice Holbert, another Crips gang member, was jailed with Davis in 1996. Holbert testified that Davis talked to him about the police station shooting. According to Holbert, Davis said he and Scott did the shooting, but planned to blame the police station shooting on Johnson to avoid prison.

Late at night on May 27, 1996, or early in the morning on May 28, approximately three weeks after the police station shooting, someone fired several gunshots into an apartment on North 40th Street in Omaha. Jerome Davis' mother lived in the victimized apartment with her boyfriend, who said that he saw an African-American man wearing a hat and a black jacket run down the alley with a sawed-off shotgun immediately after he heard the shots. Police investigating the scene found five spent shotgun shells on the ground outside the building.

A minister at a nearby church on 41st and Charles Streets was working late on May 27, 1996, when he heard what sounded like gunshots and proceeded to look outside. Then, he heard a car door slam, tires squeal, and saw a Caprice Classic with no headlights speed around the corner. The minister said that the car had an African-American driver and no passengers when it sped away.

While police were investigating the shooting at the apartment on 40th Street, there was another shooting at an apartment complex on Yates Street. Police at the Yates Street scene found two spent shotgun shells and spoke with Jeanine Davis, a resident of the apartment not related to

or familiar with Jerome Davis. She said that her cousin had been arguing with people earlier in the evening because he wore a red Kansas City sweatshirt (red is the color of the Bloods gang). Davis said that the people her cousin argued with alleged that her cousin was "disrespecting" them. She described the group arguing with her cousin as "just a whole bunch of little boys from the neighborhood." However, on re-direct examination, Davis testified as follows:

> Q. Ms. Davis, how old is your cousin?
> A. He just turned 19.
> Q. Now, do you know if the people he was arguing with, were they younger than him?
> A. I don't have no idea how old they are.

Jeanine also testified that after the conversation, the group that approached her cousin said there were not any problems and that they just did not want her cousin to wear the outfit around the apartment anymore.

Soon after these two shootings, police saw a greyish-blue 4-door sedan driving slowly south on 33rd Street, without its headlights on. When the officers tried to stop the car, it fled and crashed into another car. Police arrested the sedan's driver, Johnson, and searched the car. Officers found a Mossberg pistol grip shotgun under the driver's seat. The shotgun found in Johnson's car was a forensic match to the two shootings that occurred earlier in the evening on 40th Street and Yates Street. After the accident, officers brought the minister to the scene, where he identified Johnson's car as the late model Caprice Classic he saw leaving the area of 41st and Hamilton Streets earlier that night.

## PROCEDURAL BACKGROUND

Johnson was charged with crimes related to all three shootings. A jury found Johnson guilty of several crimes related to the shootings at the apartments on 40th Street and Yates Street, but none related to the police station shooting. A jury convicted Johnson of: being a felon in possession of a deadly weapon, operating a motor vehicle to avoid arrest, two counts of unlawful discharge of a firearm at an occupied building or dwelling, and two counts of use of a firearm to commit a felony. Johnson was sentenced to an aggregate period of 60 to 100 years' imprisonment.

Johnson filed a direct appeal after his jury trial. He alleged that the trial court had erred by denying his motion for separate trials and by imposing an excessive sentence. This court rejected both assignments of error and the Nebraska Supreme Court denied Johnson's petition for further review.

In 2003, Johnson filed a motion for postconviction relief. The district court denied his petition, and Johnson appealed. On appeal, Johnson argued that the district court erred by failing to recuse itself from his case and in denying his motion for postconviction relief without an evidentiary hearing. The State filed a motion for summary affirmance and argued that Johnson's recusal argument was procedurally barred and that the district court properly denied the postconviction claims without an evidentiary hearing. This court granted the State's motion for summary affirmance.

Johnson filed a second motion for postconviction relief in 2008. With that motion, Johnson included affidavits from Danny Robinson and Myron Pierce. Both Robinson and Pierce testified that they were part of the group of teenagers that argued with Jeanine's cousin at the Yates Street shooting location. They said that a man named Albert Rucker (also known as "Twig") brought out a Mossberg pistol grip shotgun from behind a dumpster. After Rucker retrieved the shotgun, Robinson said that he knocked on the door of the apartment while Rucker fired twice into the apartment window. Robinson and Pierce said that after the shooting, Rucker gave the shotgun to Scott and then all parties went their separate ways.

The district court denied Johnson's second petition for postconviction relief after concluding that all claims of trial error were procedurally barred and the claims of ineffective assistance of counsel were invalid because there is no constitutional right to effective assistance of postconviction counsel. Johnson did not appeal this denial.

Johnson filed this third motion for postconviction relief and request for evidentiary hearing or, in the alternative, a petition writ of error coram nobis on February 19, 2015, claiming to have "newly discovered evidence" proving his innocence. He alleged that in February 2014, Susan Heurta, with whom Johnson is now in a romantic relationship, reached out to him before they ever met and said she witnessed the shooting on Yates Street and heard the verbal altercation leading up to the shooting. Huerta knew that Johnson was not the shooter, but kept quiet because she feared retaliation for what she believed to be a gang-related matter. The district court for Douglas County denied both the motion and petition on September 23, 2015. The district court reviewed all the evidence and found that Johnson did not meet the "extraordinarily high" threshold for a strong demonstration of actual innocence. The district court also concluded that Huerta's testimony would not have prevented Johnson's conviction because the jury would have weighed her credibility and the value of her testimony against all other evidence in the case. The district court noted that the mere possibility of a different result at trial is not sufficient to grant a writ of error coram nobis.

ASSIGNMENT OF ERROR

Restated, Johnson assigns that the district court erred by not finding that newly discovered evidence warranted relief either through his postconviction claim or his petition for writ of error coram nobis.

STANDARD OF REVIEW

In appeals from postconviction proceedings, we review de novo a determination that the defendant failed to allege sufficient facts to demonstrate a violation of his or her constitutional rights or that the record and files affirmatively show that the defendant is entitled to no relief. *State v. Edwards*, 284 Neb. 382, 821 N.W.2d 680 (2012).

A court must grant an evidentiary hearing to resolve the claims in a postconviction motion when the motion contains factual allegations which, if proved, constitute an infringement of the defendant's rights under the Nebraska or federal Constitution. *State v. Edwards, supra*. But if a postconviction motion alleges only conclusions of fact or law, or if the records and files in the case affirmatively show that the defendant is entitled to no relief, the court is not required to grant an evidentiary hearing. *Id.*

The common-law writ of error coram nobis exists in this state under Neb. Rev. Stat. § 49-101 (Reissue 2010), which adopts English common law to the extent that it is not inconsistent with the Constitution of the United States, the organic law of this state, or any law passed by our Legislature. *State v. Hessler*, 288 Neb. 670, 850 N.W.2d 777 (2014). The burden of proof in a proceeding to obtain a writ of error coram nobis is upon the applicant claiming the error, and the alleged error of fact must be such as would have prevented a conviction. It is not enough to show that it might have caused a different result. *Id.*

ANALYSIS

*Johnson's New Evidence.*

Johnson's newly discovered evidence is an affidavit from Huerta and an affidavit from her father, Ben Koenig. Huerta wrote Johnson a letter in February 2014, informing him that she witnessed the Yates Street shooting in 1996 and knew Johnson was not the shooter. Huerta then provided her testimony via affidavit on January 26, 2015.

Huerta described visiting a man named Cookie at an apartment on Yates Street on May 27, 1996. Late that night, sometime after 10:30 p.m., the occupants of the apartment next door and some "teenagers" outside the complex started arguing. She recalled that the dispute arose because one occupant of the apartment next door was wearing red, a color worn by members of the Bloods gang, while the surrounding area was controlled by the Crips gang, who wear blue.

Huerta saw four teenagers outside the building, all of whom appeared skinny and no more than 14 or 15 years old, and one of them was wearing a hoodie. After the argument started, Huerta went back inside. The arguing stopped for about 15 to 20 minutes but then started again, after which time she went back outside. She saw a man wearing red in the window of the apartment next door. According to Huerta, the man in red said "We ain't got no beef with you, Twig. We ain't got no beef with you, Twig." Then, the teenager wearing the hoodie displayed a gun that looked like a pistol and fired at least two shots at the apartment in which the man wearing red stood. After the shots, Huerta went back inside, picked up her daughter, and left the apartment. She drove to her father's house and told him what she witnessed.

Koenig also provided his testimony via affidavit on January 26, 2015. He said Huerta arrived at his home, unannounced, late at night on May 27, 1996, or early in the morning of May 28, and was distraught. He said she described a shooting in Omaha that she had observed and she was "terrified." Koenig told Huerta to remain quiet about the shooting because it seemed gang related.

In her affidavit, Huerta said she followed her father's advice even though she saw a television news story about Johnson's arrest for the shooting she witnessed and "knew immediately that the Defendant [Johnson] was not the shooter. The Defendant was much older than any of the boys present that evening, and much heavier than any of them." Huerta says that her silence has bothered her for the last 18 years. Eventually, she found Johnson's location and wrote him a letter about what she knew. Before writing the letter, she had never met Johnson, spoken with him, or had any other knowledge of him besides his arrest and conviction for the shooting. However, at the time of this appeal, Huerta and Johnson acknowledged that they are now in a romantic relationship.

*Constitutional Claim for Postconviction Relief.*

The Nebraska Postconviction Act (Neb. Rev. Stat. § 29-3001 et seq. (Reissue 2016)) provides that postconviction relief is available to a prisoner in custody under sentence who seeks to be released on the ground that there was a denial or infringement of his constitutional rights such that the judgement was void or voidable. *State v. Phelps*, 286 Neb. 89, 834 N.W.2d 786 (2013). In a motion for postconviction relief, the defendant must allege facts which, if proved, constitute a denial or violation of his or her rights under the U.S. or Nebraska Constitution, causing the judgment against the defendant to be void or voidable. *Id.*

A court must grant an evidentiary hearing to resolve the claims in a postconviction motion when the motion contains factual allegations which, if proved, constitute an infringement of the defendant's rights under the Nebraska or federal Constitution. *Id.* If a postconviction motion alleges only conclusions of fact or law, or if the records and files in the case affirmatively show that the defendant is entitled to no relief, the court is not required to grant an evidentiary hearing. *Id.*

A postconviction motion asserting a persuasive claim of actual innocence might constitute a constitutional violation, in that such a claim could arguably amount to a violation of a movant's procedural or substantive due process rights. *Id.* However, in order to even trigger a court's consideration of whether continued incarceration could give rise to a constitutional claim that can be raised in a postconviction motion, there must be a strong demonstration of actual innocence because after a fair trial and conviction, a defendant's presumption of innocence disappears. *Id.*

In *State v. DeJong*, 292 Neb. 305, 872 N.W.2d 275 (2015), DeJong filed a motion for postconviction relief arguing that she was actually innocent. She contended that there were no direct witnesses to the murder for which she was convicted and that there was insufficient DNA or other physical evidence to link her to the murder. Our Supreme Court wrote that "when viewed in the light of the extensive evidence adduced at trial . . . [DeJong's] allegations fall well short of the 'extraordinarily high' threshold showing of actual innocence which she would be required to make before a court could consider whether her continued incarceration would give rise to a constitutional claim." *Id.* at 332, 872 N.W.2d at 292.

In *State v. Lotter*, 278 Neb. 466, 771 N.W.2d 551 (2009), Lotter presented what he described as new evidence that demonstrated his innocence. This new evidence was an affidavit from a trial witness signed 14 years after the crime. The witness said that his testimony at trial had been false and that he, not the defendant, had shot three individuals. The witness did not recant any other portion of his trial testimony. The Nebraska Supreme Court concluded that this evidence of perjury by a key witness was not, in and of itself, a constitutional violation and thus did not qualify as a showing of actual innocence and did not require an evidentiary hearing.

In *State v. Phelps, supra*, Phelps filed a motion for postconviction relief, alleging that a diary qualified as newly discovered evidence and demonstrated his actual innocence. The Nebraska Supreme Court rejected Phelps' claim, writing that he "[did] not come before the court in this postconviction case 'as one who is "innocent," but, on the contrary, as one who has been convicted by due process of law.'" *Id.* at 95, 834 N.W.2d at 792 (internal citations omitted). The Court noted that Phelps did not allege any personal knowledge of the diary's actual content or

explain in any detail how its contents would necessarily exonerate him of the crime, and said his allegations were speculative and conclusory and that, when viewed in light of the trial evidence, Phelps' allegations fell far short of the "extraordinarily high" threshold showing of actual innocence required before a court could even consider whether his continued incarceration would give rise to a constitutional claim. *Id.*

Johnson claims that when "analyzing whether newly discovered evidence is sufficient to provide a 'strong demonstration of actual innocence', [sic] the question is whether the evidence is 'of such a nature that had it been offered and admitted at the former trial, it probably would have produced a substantially different result.' *State v. Harris*, 2 Neb. App. 692, 513 N.W.2d 46 (1994)." Brief for appellant at 13. However, in *Harris*, this court did not define the phrase "strong demonstration of actual innocence" as Johnson suggests, nor did *Harris* involve a postconviction motion. The defendant in *Harris* filed a motion for new trial pursuant to Neb. Rev. Stat. § 29-2101(5) (Reissue 1989) and the above language pertained to newly discovered evidence in the context of § 29-2101(5), and is not persuasive here.

Johnson argues that Huerta's testimony corroborates other witness testimony, particularly that of Jeanine Davis. He also believes that Huerta is a "completely uninterested witness" who saw the shooter at the time of the 1996 incident on Yates Street. He contends that, at a minimum, Huerta's testimony would have "probably" caused a different result at trial.

Huerta's affidavit does not corroborate Jeanine's testimony. While Jeanine did testify that her cousin argued with "a bunch of little boys from the neighborhood," when asked if these "little boys" were older or younger than her 19-year-old cousin, she said she had "no idea" how old they actually were. While Huerta says that the group of adolescents she saw "appeared to be no more than 14 or 15 years old," this statement does not confirm Jeanine's more general comment. Jeanine might have used "little boys" in a pejorative manner or she might have called all men younger than her "little boys." Because we do not have more detail, we cannot say that Huerta's testimony corroborates Jeanine's testimony, as Johnson suggests.

Johnson also argues that Huerta's testimony is "that of a completely uninterested witness." At the time of the shooting 18 years ago, Huerta was not personally acquainted with Johnson. However, now, both she and Johnson acknowledge that they are in a romantic relationship. This status is almost certainly relevant to Huerta's testimony because in an evidentiary hearing for postconviction relief, the postconviction trial judge, as the trier of fact, resolves conflicts in evidence and questions of fact, including witness credibility and the weight to be given a witness' testimony. *State v. Benzel*, 269 Neb. 1, 689 N.W.2d 852 (2004).

Had the sort of testimony found in the Huerta and Koenig affidavits been offered at trial, it could have been weighed and considered by the jury and compared to the other evidence, requiring the jury to decide issues of credibility. See *Herrera v. Collins*, 506 U.S. 390, 113 S. Ct. 853, 122 L. Ed. 2d 203 (1993). Huerta and Koenig's affidavits are two pieces of a much larger puzzle. Witnesses described one African-American male flee the scene in a car just like the one Johnson drove. Police discovered the shotgun used in both the 40th Street and Yates Street shootings in Johnson's car, shortly after the Yates Street shooting. The shotgun was a ballistic match to the shells found at both shootings. The current relationship between Huerta and Johnson, combined with the 18-year delay before coming forward, impacts the credibility of the affidavit

evidence. Considering the evidence in the record and the questionable value of the Huerta and Koenig affidavits, we cannot say that the affidavits qualify as a strong demonstration of actual innocence. The affidavits are not so convincing that they cast serious doubt on Johnson's conviction. The district court did not err when it dismissed the motion for postconviction relief without an evidentiary hearing.

*Petition for Writ of Error Coram Nobis.*

The purpose of a writ of error coram nobis is to bring before the court rendering judgment matters of fact which, if known at the time the judgment was rendered, would have prevented its rendition. *State v. Harris*, 292 Neb. 186, 871 N.W.2d 762 (2015). The writ reaches only matters of fact unknown to the applicant at the time of judgment, not discoverable through reasonable diligence, and which are of a nature that, if known by the court, would have prevented entry of judgment. *Id.* The writ is not available to correct errors of law. *Id.* The burden of proof in a proceeding to obtain a writ of error coram nobis is upon the applicant claiming the error, and the alleged error of fact must be such as would have prevented a conviction. *Id.* It is not enough to show that it might have caused a different result. *Id.*

As with his motion for postconviction relief, Johnson presents the Huerta and Koenig affidavits as the newly discovered evidence in his petition for the writ of error coram nobis. Johnson received Huerta's letter no earlier than February 21, 2014. Johnson contends that Huerta's testimony "most certainly would have prevented a conviction" had it been available at trial. Brief for appellant at 17. He contends that Huerta was a completely disinterested witness at the time of trial, that her testimony contains no hearsay, and that her testimony is not contradicted by any evidence at trial. He argues that had Huerta testified at trial, "the jury would have had the opportunity to weigh Huerta's testimony against the most incriminating evidence of [Johnson] - including the fact that the gun was found in [Johnson's] car" one hour after the Yates Street shooting. Brief for appellant at 17-18.

Johnson "recognizes that Huerta's testimony is only her observations of the Yates Street shooting." Brief for appellant at 18. He argues, however, that the only evidence directly connecting Johnson to either shooting was the gun used to fire the shots that was found in his vehicle after he was involved in a crash and that his vehicle was identified as the vehicle driving away from the area of the 40th Street shooting. He further argues

> In order to find that Huerta's evidence would not have prevented a conviction on the 40th Street shooting, one would have to conclude that [Johnson] shot into the 40th Street residence, gave the gun to someone else (whether Twig, or someone else who gave the gun to Twig), then later got the gun back from someone (again, either Twig, or someone to whom Twig gave the gun), and then was involved in the crash. There is no evidence that [Johnson] interacted with any person in between the 40th Street shooting, and the Yates Street shooting. Therefore, there is simply no evidence to support what one would have to believe in order to find that Huerta's evidence would not have prevented a conviction.

Brief for appellant at 19.

The State first argues that Huerta's affidavit is not a "'matter of fact' that would have prevented the rendition of judgment . . . it is just an unsubstantiated assertion from Huerta - who admits she is romantically involved with Johnson - that Johnson is innocent of the Yates shooting that occurred back in 1996." Brief for appellee at 25. However, the affidavit concerns facts surrounding the shooting, e.g. who was, in fact, responsible for the shooting. The State argues that the alleged newly discovered evidence is "clearly not a 'matter of fact' that would have prevented the rendition of judgment. It is not even a matter of fact . . . it is just an unsubstantiated assertion from Huerta . . . that Johnson is innocent of the Yates Streets shooting." Brief for appellee at 25.

The State also argues that the Huerta affidavit would not have prevented judgment because the jury would have considered it along with the other evidence available.

> It would simply come down to the weight and credibility of the evidence at trial, including the credibility of Huerta's testimony. Huerta's credibility and motive for testifying could have been called into question then, just as it has now, so there is simply no basis to conclude that Johnson would have been acquitted based on her testimony. Especially when, as set forth above, the State presented ample evidence tying Johnson to both shootings and the jury found him guilty beyond a reasonable doubt based on the evidence.

*Id*.

We agree with the State. The standard for a writ of error coram nobis is extraordinarily high. The new evidence must be a matter of fact so significant that, had it been available at trial, Johnson would not have been convicted. It is not enough to show that it might have caused a different result. *State v. Harris*, 292 Neb. 186, 871 N.W.2d 762 (2015). Huerta's affidavit does not meet this high standard. Had similar testimony been offered at trial, no part of Huerta's information would automatically prevent a conviction. The jury would have had to weigh Huerta's credibility and her testimony along with the other evidence. The jury would be required to decide whether or not they believed her testimony over the presence of a weapon in Johnson's car, the ballistic match between that weapon and the shells at the scene of the shootings, the other witness testimony tying Johnson's car to the shootings, and the timeline of events.

The district court did not err in dismissing Johnson's petition for writ of error coram nobis.

## CONCLUSION

For the reasons stated above, we find that the district court did not err in denying Johnson's motion for postconviction relief without an evidentiary hearing or his petition for a writ of error coram nobis.

AFFIRMED.