IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


STATE V. COLEMAN


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


STATE OF NEBRASKA, APPELLEE,

V.

MICHAEL COLEMAN, APPELLANT.


Filed August 8, 2023.    No. A-22-597.


Appeal from the District Court for Douglas County: DUANE C. DOUGHERTY, Judge. Affirmed.

Taylor N. Renfro, Stuart J. Dornan, and Jason E. Troia, of Dornan, Troia, Howard, Breitkreutz, Conway & Dahlquist, P.C., L.L.O., for appellant.

Michael T. Hilgers, Attorney General, and Jordan Osborne for appellee.


RIEDMANN, BISHOP, and WELCH, Judges.

WELCH, Judge.

## I. INTRODUCTION

Michael Coleman appeals the Douglas County District Court's denial of his amended motion for postconviction relief without an evidentiary hearing. He argues that he was entitled to an evidentiary hearing to address his claims that his due process rights were violated by the admission of identification testimony at trial; his claims of trial counsel's ineffective assistance at trial; and his claims of appellate counsel's ineffective assistance in connection with his direct appeal. For the reasons set forth herein, we find that the district court did not err in dismissing Coleman's motion for postconviction relief without an evidentiary hearing.

## II. STATEMENT OF FACTS

### 1. TRIAL AND SENTENCING

In *State v. Coleman*, No. A-19-890, 2020 WL 4590427 (Neb. App. Aug. 11, 2020), this court recounted the facts surrounding the May 2018 shooting of Randy Stella. We described the events as follows:

> In May 2018, Randy Stella, Jason Cribbs, Melvin McPhaul, and Andrew Ray gathered at a bar in Omaha, Nebraska, to watch the NBA playoffs. Upon arriving at the bar, Stella parked his car directly in front of the bar's main entrance and went inside to join his friends. A few hours later, upon exiting the bar and getting into his car to leave, Stella heard a very loud bang, lost his vision, his ears began ringing, and he felt blood running down his neck and chest. As his vision returned, he looked around and noticed a dark figure with long hair standing outside his car. The man shot Stella. Stella's injuries consisted of a bullet entrance wound below his right ear and a bullet exit hole in his jaw. A short time later, an ambulance arrived and took Stella to a hospital for treatment. At the emergency room, Stella told law enforcement that the shooter was a black male with dreadlocks and a red shirt.

*State v. Coleman, supra*. After an investigation, Coleman was identified as the shooter and was charged with second degree assault, use of a deadly weapon to commit a felony, and possession of a firearm by a prohibited person.

During Coleman's trial, the State adduced testimony from numerous witnesses including Jason Cribbs, Melvin McPhaul, Andrew Ray, law enforcement officers, and Rony Lozada. This court's opinion at *State v. Coleman*, No. A-19-890, 2020 WL 4590427 (Neb. App. Aug. 11, 2020) set forth the following summaries of their testimony:

#### (a) Jason Cribbs

> Stella left the bar, and 1 to 2 minutes after that McPhaul and Cribbs were also leaving. Cribbs heard a shot and "heard [a] gun drop," then saw a man with long dreadlocks in a dark red or black shirt a few feet away from Stella's car reach down to pick up the gun and then run to a silver truck, which drove off. On cross-examination, Cribbs testified he did not see a gun, but, rather, heard the shot and then "heard the gun drop." Cribbs acknowledged that part of the parking lot was a little dark.

#### (b) Melvin McPhaul

> McPhaul testified that Stella left the bar, and a few minutes later McPhaul and Cribbs left as well. McPhaul was in the bar's entryway when he heard a gunshot and saw a man with dreadlocks, wearing a red shirt and shorts, moving toward the car that was straight ahead to the left. McPhaul opined that the man looked like he was picking up something as he was moving to McPhaul's left and entered a silver truck, which then left the parking lot. McPhaul noted that man was the only person he saw in the area after hearing the gunshot.

On cross-examination, McPhaul was asked about his deposition testimony in which he stated he saw the suspect wearing a red T-shirt and a blue hat, and McPhaul testified that he recalled saying that during his deposition. On redirect, McPhaul clarified that he saw the suspect wearing a hat when he entered the bar but was not sure if he was wearing the hat outside by the truck.

### (c) Andrew Ray

Ray testified that when he initially entered the bar, a man with dreadlocks and wearing a red T-shirt walked toward him, but Ray did not think anything of it at the time other than just making a "mental note" that someone was walking towards him. The next time Ray recalled seeing the aforementioned man that night was in the bar's parking lot. Ray explained that he had left the bar approximately 5 to 7 minutes after Stella left and that as Ray was retrieving an item from his trunk, he heard a popping sound and saw a white sedan roll back a little bit. Next, Ray saw the man hunched over, running from the sedan as if "he was trying to conceal something in his waistband" and then enter a silver truck that sped off. Ray testified that after hearing the shot, nothing obstructed Ray's viewpoint between himself and the man, and that the parking lot was lit. As the truck sped off, Ray memorized the truck's license plate number.

Ray testified that the man he described was Coleman and made an in-court identification of Coleman. Additionally, Ray testified no other individuals with dreadlocks were in the bar that evening, and he estimated that approximately 10 minutes elapsed from the time Stella left the bar to the time Ray heard the popping sound.

### (d) Law Enforcement Testimony

Law enforcement determined that the license plate number of the silver truck was registered to Veronica Busch, who informed law enforcement that Coleman was her "on-again, off-again boyfriend" who drove the truck, and that in April 2018, Coleman had been stopped for speeding while driving the truck.

### (e) Rony Lozada

Lozada testified that he was seated in the patio area of the bar when he observed a dark gray truck in the parking lot. Lozada explained that at one point he saw a person exit the bar and walk to a car. At the same time, he also saw a black man with shoulder-length dreadlocks, a red shirt, and dark shorts, possibly gray or black, crouching while approaching the car. Lozada thought the man with dreadlocks was approximately 5′8″ or 5′9″ tall and weighed about 170 or 180 pounds. Then Lozada heard a loud noise and saw the man with dreadlocks running to the gray truck, which quickly sped off. Lozada estimated that less than a minute elapsed from the time he heard the loud noise to the time the truck sped out of the parking lot.

Surveillance video from the bar and a nearby business was received into evidence. The video surveillance from the bar showed Coleman, who had shoulder-length dreadlocks, wearing a

red Nike shirt and shorts. Stella testified that as he was leaving the bar on the night of the shooting, he looked back and saw a man with a red shirt exiting the bathroom. The bar's interior surveillance video last captured Coleman walking south heading toward the bar's main entrance/exit at 11 p.m. The 911 call was received at 11:03 p.m.

After the State rested, the defense called Jason Lemkin who testified that, on the night in question, he was sitting in the bar's outdoor patio area when he heard a gunshot. He then observed a black male in a red shirt sit down in Stella's car. According to Lemkin, the individual "looked like he grabbed something and put it in his pocket" and that the man looked like "[h]e didn't want anybody [to] see him doing it." However, Lemkin also admitted that it seemed as if the black male knew the person who had been shot and the individual could have just been scared that his friend had been shot. Lemkin further admitted that he pointed out the man to police "because [the man] was still standing around" and that the man that he saw that night was not Coleman. Following this testimony, the State and defense stipulated that, if called as a witness, Gerald Jones would testify that he was with other individuals at the bar watching the NBA playoffs on the night of the shooting, that he was wearing a red shirt and glasses, and that he entered Stella's vehicle and used Stella's phone to attempt to call Stella's mother.

The jury convicted Coleman of the charged offenses. Thereafter, the court sentenced Coleman to 35 to 40 years' imprisonment for each offense, to run consecutively, which included a habitual criminal enhancement.

## 2. DIRECT APPEAL

In his direct appeal, Coleman, who was represented by different counsel than had represented him during this trial and sentencing, assigned as error that there was insufficient evidence to support his convictions and that his "trial counsel provided assistance of counsel so deficient that, but for counsel's deficient performance, the result of the proceeding below would have been different." *Id*. This court rejected Coleman's claim that the evidence was insufficient to support his convictions and held that Coleman's assigned error that "trial counsel provided assistance of counsel so deficient that, but for counsel's deficient performance, the result of the proceeding below would have been different" was "a general allegation and clearly lacks the specificity required by [*State v. Mrza*, 302 Neb. 931, 926 N.W.2d 79 (2019),]" and thus, Coleman had failed to raise an ineffective assistance of trial counsel claim on direct appeal. *State v. Coleman, supra*. The mandate issued on September 15, 2020.

## 3. POSTCONVICTION

On September 10, 2021, Coleman filed a verified motion for postconviction relief, which was subsequently amended. The amended motion alleged: (1) Coleman was denied due process regarding a witness' identification of him as the shooter; (2) there was insufficient evidence to support his convictions; (3) his trial counsel was ineffective in (a) failing to cross-examine a police officer concerning discrepancies in his testimony, (b) failing to impeach an off-duty officer on prior inconsistent statements regarding his identification of Coleman, (c) stipulating to the statement of witness Gerald Jones, (d) failing to depose two witnesses, (e) failing to present expert witness testimony regarding eyewitness misidentification, (f) failing to object to the off-duty

officer's testimony that he saw Coleman "running like he was trying to conceal something in his waistband," (g) failing to investigate and file a motion to suppress the impermissible eyewitness identification by an off-duty officer who was present at the scene; and (4) his appellate counsel on direct appeal was ineffective for failing to specifically state in the brief for appellant how trial counsel was ineffective.

The district court denied Coleman's amended motion for postconviction relief without an evidentiary hearing. In doing so, the court considered the allegations of the ineffectiveness of trial counsel to be incorporated into Coleman's allegations of ineffective assistance of appellate counsel. The court found that Coleman's claims failed because they were either procedurally barred, were not pled with specificity, were affirmatively refuted by the record, or "fail[ed] to set forth any authority or argument to establish that any of the issues in his motion could have changed the outcome of the appeal." Coleman has timely appealed to this court.

### III. ASSIGNMENTS OF ERROR

Coleman contends that the district court erred in denying his amended motion for postconviction relief without an evidentiary hearing. He has identified 13 assignments of error on appeal which can be divided into three specific areas: (1) the violation of his due process rights due to insufficiency of the evidence to support his convictions based upon his claim that the identification procedures used by law enforcement resulted in his misidentification as the shooter; (2) the ineffectiveness of trial counsel both prior to and during his trial; and (3) the ineffectiveness of his appellate counsel.

### IV. STANDARD OF REVIEW

When a district court denies postconviction relief without conducting an evidentiary hearing, an appellate court determines de novo whether the petitioner has alleged facts that would support the claim and, if so, whether the files and records affirmatively show that he or she is entitled to no relief. *State v. Jennings*, 312 Neb. 1020, 982 N.W.2d 216 (2022).

Whether a claim raised in a postconviction proceeding is procedurally barred is a question of law, which an appellate court reviews de novo. *State v. Dubray*, 294 Neb. 937, 885 N.W.2d 540 (2016).

### V. ANALYSIS

Coleman appeals the district court's denial of his motion for postconviction relief without an evidentiary hearing. Before turning to the merits of Coleman's claims, we briefly review the standard for motions for postconviction relief before addressing Coleman's specific claims that he asserts entitled him to an evidentiary hearing.

The district court must grant an evidentiary hearing to resolve the claims in a postconviction motion when the motion contains factual allegations which, if proved, constitute an infringement of the defendant's rights under the state or federal Constitution. *State v. Jennings, supra*. However, the allegations in a motion for postconviction relief must be sufficiently specific for the district court to make a preliminary determination as to whether an evidentiary hearing is justified. *Id.* An evidentiary hearing is not required on a motion for postconviction relief when (1)

the motion does not contain factual allegations which, if proved, constitute an infringement of the movant's constitutional rights rendering the judgment void or voidable; (2) the motion alleges only conclusions of fact or law without supporting facts; or (3) the records and files affirmatively show that the defendant is entitled to no relief. *Id.*

## 1. DUE PROCESS

Coleman first assigns that the district court erred in dismissing his due process claims without an evidentiary hearing. More specifically, Coleman alleges that his due process rights were violated by the admission of Ray's testimony at trial identifying Coleman as the shooter. Coleman argues that because Ray was allowed to review surveillance video and a photograph in advance of his identification testimony, the admission of that testimony violated his due process rights and, without it, there was insufficient evidence to support his convictions.

As the Nebraska Supreme Court noted in *State v. Dubray*, 294 Neb. 937, 947, 885 N.W.2d 540, 551 (2016), "[u]nder the Nebraska Postconviction Act, a prisoner in custody may file a petition for relief on the grounds that there was a denial or infringement of the prisoner's constitutional rights that would render the judgment void or voidable. This category of relief is 'very narrow.'"

Here, Coleman attempts to argue that the admission of Ray's testimony violated his constitutional due process rights. This is not a claim of "actual innocence" or newly discovered evidence. Instead, Coleman presents an alleged evidentiary error that he attempts to cloak under the umbrella of a due process violation in connection with a postconviction motion. But as the Nebraska Supreme Court held in *State v. DeJong*, 292 Neb. 305, 330, 872 N.W.2d 275, 291 (2015):

> To the extent [the defendant] alleges that her constitutional rights of due process, the presumption of innocence, her right to a fair trial, and her right to privacy were violated when the evidence related to the prior bad acts was admitted at trial, this claim is procedurally barred. We have stated that the need for finality in the criminal process requires that a defendant bring all claims for relief at the first opportunity. *State v. Watkins*, 284 Neb. 742, 825 N.W.2d 403 (2012). It is fundamental that a motion for postconviction relief cannot be used to secure review of issues which were known to the defendant and could have been litigated on direct appeal. *Id*. And in this case, the prior bad acts issues were both known to and litigated by [the defendant] on direct appeal. We have recently stated: "A motion for postconviction relief cannot be used to secure review of issues which were or could have been litigated on direct appeal, no matter how those issues may be phrased or rephrased." *State v. Thorpe*, 290 Neb. 149, 156, 858 N.W.2d 880, 887 (2015).

See also *State v. Thorpe*, 290 Neb. 149, 858 N.W.2d 880 (2015) (motion for postconviction relief cannot be used to secure review of issues which were or could have been litigated on direct appeal, no matter how those issues may be phrased or rephrased). Any attempts to raise issues at the postconviction stage that were or could have been raised on direct appeal are procedurally barred. *State v. Dubray*, 294 Neb. 937, 885 N.W.2d 540 (2016).

Because the admission of Ray's testimony is a matter which could have been raised on direct appeal, we reject the claim now as fitting within this "very narrow" category of relief and

find the district court did not err in finding that Coleman's due process claims related to Ray's identification of Coleman as the shooter and insufficiency of the evidence claims are procedurally barred.

## 2. INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

Next, Coleman claims that the district court erred in denying his motion for postconviction relief without an evidentiary hearing based upon the ineffectiveness of his trial counsel both prior to and during his trial, including but not limited to, counsel's failure to depose witnesses, to file a motion to suppress, to properly cross-examine witnesses, to present expert testimony regarding eyewitness misidentification, and counsel's stipulation to witness statements. As we previously stated, Coleman was represented on direct appeal by different counsel and any claims regarding the ineffectiveness of trial counsel could have been raised on direct appeal. Any attempts to raise issues at the postconviction stage that were or could have been raised on direct appeal are procedurally barred. *State v. Dubray, supra*. Because Coleman either raised or could have raised these issues on direct appeal, these claims are procedurally barred.

## 3. INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

Coleman's final claim is that his appellate counsel was ineffective in failing to specifically set forth on direct appeal the ways in which trial counsel was ineffective. In his direct appeal, Coleman's appellate counsel alleged that his "trial counsel provided assistance of counsel so deficient that, but for counsel's deficient performance, the result of the proceedings would have been different." *State v. Coleman*, No. A-19-890, 2020 WL 4590427 (Neb. App. Aug. 11, 2020). As a result of this vague allegation, this court held, "This assigned error is a general allegation that clearly lacks the specificity required by [*State v.*] *Mrza*[, 302 Neb. 931, 926 N.W.2d 79 (2019)]. Accordingly, Coleman has failed to raise an ineffective assistance claim on direct appeal."

In his postconviction motion, the limited claims of ineffective assistance of Coleman's appellate counsel were set forth in paragraphs 65 and 66 where he alleged as follows:

65. That [Coleman] was denied his right to effective assistance of counsel . . . in that appellate counsel did not specifically state in the Appellant's brief how his trial counsel was ineffective.

66. . . . [and that Coleman's] [a]ppellate counsel's actions were so deficient that the Nebraska Court of Appeals was unable to address [Coleman's] ineffective assistance of counsel claim due to counsel's error in not specifically stating how trial counsel was ineffective. Had appellate counsel specifically stated how trial counsel was ineffective, [Coleman] would have had his claims addressed by the Nebraska Court of Appeals. Further, [Coleman] was prejudiced because the Nebraska Court of Appeals summarily dismissed [his] ineffective assistance of counsel claim due to [appellate] counsel's error.

The district court construed this claim to incorporate the claims of ineffective assistance of trial counsel contained elsewhere in Coleman's amended motion for postconviction relief. We likewise consider Coleman's recitation of his trial counsel's ineffective assistance claims as incorporated into layered claims on appeal.

As the Nebraska Supreme Court explained in *State v. Parnell*, 305 Neb. 932, 946, 943 N.W.2d 678, 688-89 (2020):

> When a claim of ineffective assistance of appellate counsel is based on the failure to raise a claim on appeal of ineffective assistance of trial counsel (a layered claim of ineffective assistance of counsel), an appellate court will look at whether trial counsel was ineffective under the *Strickland* [*v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L.Ed.2d 674 (1984)] test. If trial counsel was not ineffective, then the defendant was not prejudiced by appellate counsel's failure to raise the issue. Much like claims of ineffective assistance of trial counsel, the defendant must show that *but for* counsel's failure to raise the claim, there is a reasonable probability that the outcome would have been different. In determining whether trial counsel's performance was deficient, courts give counsel's acts a strong presumption of reasonableness.

When analyzing a claim of ineffective assistance of appellate counsel, courts usually begin by determining whether appellate counsel failed to bring a claim on appeal that actually prejudiced the defendant. *State v. Johnson*, 298 Neb. 491, 904 N.W.2d 714 (2017). That is, courts begin by assessing the strength of the claim appellate counsel failed to raise. *Id.* Counsel's failure to raise an issue on appeal can be ineffective assistance only if there is a reasonable probability that inclusion of the issue would have changed the result of the appeal. *Id.*

Here, Coleman's layered claims, consolidated and restated, are that Coleman's appellate counsel was ineffective in failing to preserve on direct appeal the following claims that trial counsel was ineffective in: (a) failing to cross-examine Officer Martinec on the discrepancy of eyewitness testimony; (b) failing to cross-examine or impeach Ray and Stella regarding prior inconsistent statements; (c) stipulating to Jones' statement; (d) failing to depose Jones and Ray; (e) failing to present expert witness testimony regarding eyewitness misidentification; (f) failing to file a motion to suppress Ray's identification of Coleman; and (g) failing to object to impermissible eyewitness identification. We examine each such claim below.

(a) Failure to Cross-Examine Officer Martinec

Coleman contends that his trial counsel was ineffective in failing to cross-examine Officer Martinec concerning alleged discrepancies in Stella's pretrial and trial descriptions of the shooter. At trial, Officer Martinec testified that, shortly after the shooting and while in the hospital, Stella stated that the shooter was "a black male with dreads and a red shirt." At trial, Stella testified that he saw "a dark image" with "something moving up top like long hair." Further, Coleman contended in his postconviction motion, that during Stella's deposition, Stella "testified that his windows were tinted and that he was groggy and [he] did not give a full description of the shooter because he did not see him."

Regardless of any alleged discrepancy in Stella's pretrial and trial descriptions of the shooter, which were made more than 1 year apart, we find that Coleman's trial counsel was not ineffective for not cross-examining Officer Martinec regarding any such discrepancy. Officer Martinec's trial testimony simply reported Stella's statements describing the shooter which he made at the hospital shortly after the shooting. Officer Martinec could not testify regarding any

alleged discrepancies in Stella's pretrial and trial descriptions because he is simply lacking in foundation to do so. In accordance with Neb. Rev. Stat. § 27-602 (Reissue 2016), "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter." As such, Officer Martinec's testimony was properly limited to recounting Stella's statements about the shooting made in his presence while in the hospital shortly after the incident, not what Stella testified to during his deposition or at trial nearly 1 year later. Further, when coupled with the fact that Stella's initial statement, which was made shortly after the shooting and nearly a year prior to the trial, was consistent with the descriptive statements of multiple witnesses, we fail to find any prejudice associated with this alleged deficiency. This claim fails.

### (b) Failure to Impeach Ray on Discrepancy in Eyewitness Testimony

Coleman next contends that his trial counsel was ineffective in failing to impeach Ray regarding alleged discrepancies in his and Stella's testimony. Coleman argues that Ray and Stella testified to conflicting lengths of time between when Stella left the bar and when the shooting occurred. Coleman argues that "[h]ad trial counsel cross-examined the witnesses regarding the inconsistent testimony, the proceedings would have been different, in that the jury would have been able to consider that [Stella] and the only witness who allegedly identified the assailant [Ray] had differing testimony, leading to questionable credibility." Brief for appellant at 19.

During the trial, Stella testified that he left the bar, walked to his vehicle, and was shot right after he started his vehicle. Ray testified that Stella left the bar "maybe five to seven minutes" before he did. Contrary to Coleman's claim that trial counsel failed to impeach Ray on the issue of the amount of time that had passed from when Stella exited the bar, when Ray exited the bar, and when the shooting occurred, the record indicates otherwise. During cross-examination, trial counsel specifically questioned Ray regarding Ray's approximation of when Stella left the bar to which Ray responded that he left the bar about 5 to 7 minutes after Stella and that heard a "pop" noise "maybe two minutes" after he exited the bar. As such, the jury was presented with the evidence governing the different versions of Ray and Stella's timelines and were able to determine what weight to accord each witnesses' testimony. We find that the evidence refutes Coleman's claim that his trial counsel was ineffective by failing to cross-examine Ray governing his timeline of events.

Further, to the extent that Coleman's motion for postconviction relief referred to any other prior inconsistent statements by Ray, i.e., Ray's prior statements regarding Coleman wearing pants vs. shorts, such claims were not argued in his appellate brief and were not preserved for review. See *State v. Lessley*, 312 Neb. 316, 978 N.W.2d 620 (2022) (alleged errors of lower court must be both specifically assigned and specifically argued in brief of party asserting errors to be considered by appellate court). However, we also note that this claim is refuted by the record because trial counsel did cross-examine Ray regarding his initial statement that Coleman was wearing shorts to statements attributed to Ray included in police reports which stated that Coleman was wearing pants.

In sum, since the jury heard both Stella's and Ray's testimony and was able to attribute as much, or as little, weight to the witnesses' testimony as they saw fit, Coleman did not receive

ineffective assistance of counsel regarding trial counsel's failure to further develop the issue at trial.

### (c) Stipulation to Jones' Testimony

Third, Coleman contends that his trial counsel was ineffective in stipulating to Jones' testimony. The parties' stipulation set forth that, if called as a trial witness, Jones would have testified that on the night of the shooting, he was wearing a red shirt and glasses and, after Stella was shot, he was inside Stella's vehicle to retrieve Stella's cell phone to call Stella's mother to inform her of the events. Coleman argues that the stipulation was contradicted by police reports containing inconsistencies as to whether Jones was inside or outside the bar when the shooting occurred. Coleman also argues that the stipulation "misled the jury to believe that Jones was there when Stella was shot." Brief for appellant at 20. Coleman further argues that "[h]ad [his trial] counsel never made the stipulation, Jones would have testified and the jury would have heard that Jones did not see who the shooter was which would have contributed to the insufficiency of the evidence to show that Coleman was in fact not the shooter." Brief for appellant at 20. These claims are refuted by the record.

Contrary to Coleman's claim that the police reports conflict with the stipulation regarding Jones' testimony, the stipulation did not contain any references regarding whether Jones was inside or outside of the bar when the shooting occurred and did not indicate whether Jones saw the shooter. Further, no reading of the stipulation could be read to infer that Jones saw the shooting. The stipulation was in rebuttal to defense witness Lemkin's testimony that after hearing a gunshot, he observed a black male in a red shirt sit down in Stella's car. According to Lemkin, the individual "looked like he grabbed something and put it in his pocket" and that the man that he saw that night was not Coleman. The stipulation to Jones' testimony served as an explanation as to the identity of the other black male on the scene who was wearing a red shirt and who was in Stella's car shortly after the shooting.

Further, Coleman acknowledges in his brief that Jones was inside the bar and not a witness to the shooting. Jones was not presented as an eyewitness to the shooting, but numerous other persons were called as eyewitnesses. We find no prejudice associated with failing to call Jones to further elaborate that he was not a witness to the shooting. This claim fails.

### (d) Failure to Depose Jones and Ray

Fourth, Coleman contends that his trial counsel was ineffective in failing to depose Jones and Ray. Coleman claims that, had trial counsel deposed Jones or Ray, counsel would have learned about the inconsistency governing Jones' location at the time of the shooting and would have known not to stipulate to Jones' testimony.

Similar to Coleman's claim that his trial counsel erred in stipulating to Jones' testimony, he similarly argues that the stipulation falsely presented that Jones was a witness to the shooting when he was in fact in the bar and that further depositions would have uncovered this inconsistency. But as we noted above, the stipulation never suggests that Jones was an eyewitness to the shooting and the stipulation was offered to clarify a defense witness' claim that he saw a black man wearing a red shirt, who was not Coleman, in Stella's car after the shooting. Because

we already found there was no prejudice associated with failing to call Jones to further elaborate that he was not an eyewitness, it follows that there was no prejudice in failing to depose either Jones or Ray to clarify that Jones was not an eyewitness to the shooting. This claim fails.

We also note that, contrary to a passing claim on page 23 of the brief for appellant that trial counsel was ineffective for failing to depose Stella, both the record of the trial and the brief for the appellant note that Stella was deposed by trial counsel. See brief for appellant at 18.

(e) Failing to Present Expert Witness Testimony
Regarding Eyewitness Misidentification

Fifth, Coleman contends that his trial counsel was ineffective in failing to present expert witness testimony regarding eyewitness misidentification. He claims that it was imperative that trial counsel provide expert testimony regarding eyewitness misidentification because his "case relied entirely on eyewitness identification." However, Coleman's motion for postconviction relief did not specify what the expert testimony would have been in relation to the eyewitness identification testimony elicited during the course of the trial. See *State v. Munoz*, 309 Neb. 285, 959 N.W.2d 806, *cert. denied* ___ U.S. ___, 142 S. Ct. 370, 211 L. Ed. 2d 197 (2021) (defendant's motion for postconviction relief required to specifically allege what potential witness' testimony would have been had witness been called at trial in order to avoid dismissal without evidentiary hearing).

During the trial, several eyewitnesses described the shooter as a black male with shoulder-length dreadlocks, wearing a red T-shirt. Two witnesses stated that they saw the shooter inside the sports bar earlier that evening and Coleman was the only person on the surveillance video inside the sports bar matching the witness' descriptions of the shooter. Further, the truck that eyewitnesses stated the shooter fled in was the same vehicle in which Coleman had been stopped for speeding the previous month and which the vehicle's owner testified that Coleman had been driving for several months. Because Coleman failed to allege what testimony an expert would have provided in relation to the extensive eyewitness identification testimony provided during the trial, this claim fails for lack of specificity.

(f) Failure to File Motion to Suppress

Sixth, Coleman contends that his trial counsel was ineffective in failing to file a motion to suppress Ray's out-of-court and in-court identifications of Coleman. He argues that Ray's viewing of the surveillance video from inside the sports bar from earlier in the evening in an attempt to identify the suspect was unduly suggestive.

In *State v. Fuentes*, 302 Neb. 919, 926-27, 926 N.W.2d 63, 69 (2019), the Nebraska Supreme Court stated:

> An identification procedure is constitutionally invalid only when it is so unnecessarily suggestive and conducive to an irreparably mistaken identification that a defendant is denied due process of law. Whether identification procedures were unduly suggestive and conducive to a substantial likelihood of irreparable mistaken identification is to be determined by a consideration of the totality of the circumstances surrounding the procedures. The factors to be considered are the opportunity of the witness to view the

- 11 -

criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness, and the length of time between the crime and the identification.

On the evening of the shooting, Ray was off-duty and was an eyewitness to the shooting. About 30 seconds after the shooting, Ray called 911 and described the shooter as a black male, about 5'7" to 5'8", with long dreadlocks wearing a red Nike T-shirt, and identified the vehicle in which the shooter fled the scene as a silver pickup and provided the truck's entire license plate number. Ray had not yet viewed the surveillance video when he provided a description of the shooter during the 911 call.

Further, after other law enforcement officers arrived at the scene, Ray informed them that he had observed the shooter inside the bar earlier that evening and that the suspect should be on the bar's surveillance video. About 15 to 20 minutes after the shooting, Ray viewed the surveillance video and identified the person in the video that he had observed earlier that evening who matched the shooter's description. That person was later identified as Coleman. Additionally, Coleman cannot establish prejudice because Ray's testimony was cumulative of three other eyewitnesses who also provided descriptions of the shooter which matched Ray's description: Cribbs described the shooter as a man with long dreadlocks in a dark red or black shirt who left the scene in a silver truck; McPhaul described the shooter as a man with dreadlocks wearing a red shirt and shorts who left the scene in a silver truck; Lozada described the shooter as a black man approximately 5'8" or 5'9" weighing about 170 to 180 pounds, with shoulder-length dreadlocks, a red shirt, and dark shorts, and left the scene in a gray truck. Coleman's claim that trial counsel was ineffective for failing to file a motion to suppress Ray's identification of Coleman fails.

### (g) Failure to Object to Impermissible Eyewitness Identification

Coleman assigned as error that his trial counsel was ineffective in failing to object to impermissible eyewitness identification. However, this claim was not argued in Coleman's brief, nor was it alleged in Coleman's motion for postconviction relief. An alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error to be considered by an appellate court. *State v. Sierra*, 31 Neb. App. 852, 990 N.W.2d 49 (2023). Further, in an appeal from the denial of postconviction relief, an appellate court will not consider for the first time on appeal claims that were not raised in the verified motion. *State v. Britt*, 310 Neb. 69, 963 N.W.2d 533 (2021). Accordingly, we decline to consider this assigned error.

### (h) Failure to Raise Claims on Direct Appeal

Having determined that all of Coleman's claims regarding trial counsel's ineffectiveness failed or were not properly preserved for our consideration, his claims against appellate counsel for failing to raise them on direct appeal likewise fail. If trial counsel was not ineffective, then the defendant was not prejudiced by appellate counsel's failure to raise the issue. *State v. Allen*, 301 Neb. 560, 919 N.W.2d 500 (2018).

- 12 -

## VI. CONCLUSION

Having considered and rejected Coleman's assigned errors, we affirm the district court's denial of his amended motion for postconviction relief without an evidentiary hearing.

AFFIRMED.